| 25 | 313 |
| 27 | 180 |
| 25 | 313 |
| 34 | 560 |
| 25 | 313 |
| 39 | 150 |
| 25 | 313 |
| 52 | 601 |
| 25 | 313 |
| d62 | 110 |
| e62 | 111 |

PRESENT:

Hon. M. B. REESE, Chief Justice.
" AMASA COBB, } Judges.
" SAMUEL MAXWELL, }

---

S. W. LITTLE ET AL., APPELLEES, V. EZEKIEL GILES ET AL., APPELLANTS.

1. Wills: CONSTRUCTION. At common law a devise of real estate, in order to convey the fee, must contain words of inheritance or perpetuity, but under the statutes of this state such words are not necessary to convey the fee, and every devise of land is to be construed to convey all of the estate of the devisor therein, unless it shall clearly appear by the will that the devisor intended to convey a less estate.

2. ———: CASE STATED: CONVEYANCE BY DEVISEE. A devise, "to my beloved wife, Editha J. Dawson, I give and bequeath all my estate, real and personal, of which I may die seized, the same to remain hers, with full power, right, and authority to dispose of the same as to her shall seem most meet and proper, so long as she shall remain my widow, upon the express condition, however, that if she shall mary again, then it is my will that all of my estate herein bequeathed, *or whatever may remain,*

[ 313 ]

shall go to my surviving children share and share alike," etc. *Held*, That under the statutes of this state a conveyance of such real estate by Editha J. Dawson, after the death of the testator and before her remarriage, conveyed the fee to such realty, and her subsequent marriage did not affect the title to the same.

3. ——— : ——— : CONSTRUCTION OF WILL. The words, "or whatever may remain," in the will, apply to both the real and personal estate, and are restricted to such part of the estate as remained undisposed of at the time of the second marriage of Mrs. Dawson.

4. ——— : ——— : ———. When a testator devises all his estate, real and personal, giving his devisee the power of unqualified disposition of the property devised, the devisee may convey the legal title thereto, and a limitation over, in a subsequent clause of the will, in favor of other persons, of "all of the estate herein bequeathed, or whatever may remain," at the marriage of the first taker will not affect the titles previously conveyed.

5. ——— : EVIDENCE OF TESTATOR'S INTENTION. Evidence of the situation of the parties may be received when it is necessary to a correct understanding of a bequest, together with the facts and circumstances which may reasonably be supposed to have influenced the testator in making the will, in order that the court may ascertain his motives and intention.

6. Attorney and Client: SALE BY ATTORNEY : ESTOPPEL. An attorney who sells real estate for his client, and represents the title to be good, which representation is relied upon, cannot thereafter assert title in himself to any of the real estate so sold.

APPEAL from the district court of Lancaster county. Heard below before CHAPMAN, J.

*O. P. Mason*, for appellants, on the construction of the the will in question, cited: *Giles v. Little*, 104 U. S., 291. It is the universal rule in construction of wills, to ascertain the intention of the testator from the words of the will, and if they be ambiguous, then and not till then, from the words of the will and the circumstances of the testator at the time of his death. *Millett v. Ford*, 109 Ind., 159, and cases cited. *Taubenhan v. Dunz* (Ill.), Vol. 17 N. E. R., 456, and cases cited. *Allen's Excrs. v. Allen,*

18 How., 385. Regard must be paid to the paramount idea of the testator as against all doubtful and conflicting provisions which might of themselves defeat it. Schouler on Wills, Sec. 476. The words are, "or whatever may remain," simply "remain," not whatever may remain *undisposed of.* Nor is it necessary to interpolate the words "undisposed of," to make sense of the clause. A word cannot be supplied unless it be necessary to make sense. *Sutherland's Exrs. v. Sydnor;* 6 S. E. Rep., 480. Schouler on Wills, Sec. 568. Wood's Prac., 53, Sec. 21. Such words or phrases, as whatever remain, and kindred expressions, will be held to give a power to convey the estate only when from other parts of the will it may be gathered that the testator intended to authorize the disposal of his estate absolutely, etc., etc. They are not controlling. 4 Am. Prob. Rep., note on p. 274. *Freeman v. Coit,* 96 N. Y., 68. *Foote v. Sanders,* 72 Mo., 616.

As to the estoppels, the facts alleged were not proved, and what facts were proved were not of the character that work an estoppel, according to rules laid down by Bigelow, 4 Ed., 552, approved and followed by this court in the late case of *Towne v. Sparks,* 36 N. W. R., 377. Even if the alleged representations of L. C. Burr were true, and if they would estop *him* from asserting title, H. H. Wheeler had no connection with or knowledge of them. He bought from the Dawson heirs their entire title, and *he* conveyed their title to defendant Giles.

See also *Dunning v. Vandusen,* 47 Ind., 423. *Patterson v. Wilson,* 64 Md., 193. *Terry v. Rodahan,* 5 S. E. Rep., 39-41. *Towles v. Fisher,* 77 N. C., 437. *Owen v. Switzer,* 51 Mo., 322. *Blake v. Hawkins,* 98 U. S., 326. *Phillips v. Brown,* 15 Atlantic Rep., 90, citing late cases.

*J. M. Woolworth,* on the same side, cited: *Clarke v. Boorman's Executors,* 18 Wallace, 493. *Blake v. Hawkins,* 98 U. S., 315. *Allen's Executors v. Allen,* 18 How., 385.

*Smith v. Bell,* 6 Peters, 68.    *Dunning v. Vandusen,* 47 Ind., 422.    *Jones v. Wood,* 16 Pa. St., 25.    *Owen v. Switzer,* 51 Mo., 322.    *Towles v. Fisher,* 77 N. C., 437.

*Harwood, Ames & Kelly, T. M. Marquett,* and *W. J. Lamb* (*W. J. Lamb* also filed separate brief), for appellees.

The will must be construed according to the laws of Nebraska, it being made in Nebraska, the property being situated in Nebraska, and probated in Nebraska.

The court must arrive at the intention of the party. Did he intend to give his wife a fee—unlimited power to dispose of it so long as she remained his widow? In arriving at the intention of the testator we must take the language of the will, the words and phrases used, and if possible give effect to every word and clause that is used. *Perry v. Hunter,* 2 R. I., 80.    2 Pickering, 243, 460. *Oxley v. Lane,* 35 N. Y., 340.    The great object is to get at the meaning by the language he uses.    The construction that we have adopted will give effect to every clause of the will, and to every word of the will, and it is the only one that will.    *Giles v. Little,* 2 McCrary, 374.    We think under these rules that Mrs. Dawson took an estate in fee, determinable by marriage.    *Freedman v. Steiner,* 107 Ill., 125.    *Benkert v. Jacoby,* 36 Iowa, 276.    *Freeman v. Coit,* 96 N. Y., 67.    *Jones v. Jones,* 25 Mich., 402.

The limitation, that is, "so long as she shall remain my widow," has something to apply to besides the bequest, viz., to the disposal.    The limitation is merely on the time she may dispose of it, and applies only to the time.    *Giles v. Little,* 2 McCrary, 374.    *Sherman v. Wooster,* 26 Iowa, 272.    *Benkert v. Jacoby,* 36 Iowa, 276.    *State v. Smith,* 52 Conn., 561.    *Ruben v. Kitchen,* 61 N. Y., 356.    *McKenzie's Appeal,* 41 Conn., 607.    5 Hill, 410.

The power given in the will to sell the fee is ample, and although a fee might not have passed to her, she certainly

has a right to sell the fee. *Bamforth v. Bamforth*, 123 Mass., 280. *Johnson v. Battelle*, 125 Mass., 453. *Sears v. Cunningham*, 122 Mass., 538. *Jones v. Bacon*, 68 Maine, 34. *Henderson v. Blackburn*, 104 Ill., 227. Our statute changes the common law doctrine, that where there is a doubt whether a fee or a life estate passed, that only a life estate passes; the heirs of the body taking the fee. This is abrogated, and now, under our law, the converse rule applies, that where there is a doubt it must be held in favor of the fee passing. *Cleveland v. Spilman et al.*, 25 Ind., 99. *Chambers v. Shaw*, 52 Mich., 18. 2 McCrary, 375. *Dew v. Kuehn*, 64 Wis., 300. *Weir v. Michigan Stove Co.*, 44 Mich., 506. *Allen's Exrs. v. Allen*, 18 Howard, U. S., 391.

The disposition of courts in our country, where we are fast abrogating the old common law rule which was in favor of perpetuity and monopoly in land, is to adopt the better rule that favors alienation, and to place such a construction upon wills as to give the estate of inheritance to the first donee. *Leiter v. Sheppard*, 85 Ill., 242. Our statute goes further, and says that every doubt shall be solved in favor of the fee passing to the first donee. *Dew v. Kuehn*, 64 Wis., 300.

MAXWELL, J.

This action was instituted by the plaintiffs, sixty-nine in number, against the defendants, to quiet the title to certain real estate in the city of Lincoln. Jacob Dawson was the common source of title, and the plaintiffs claim under his widow, the defendants claim under his children, and the determination of the case depends upon the construction of the will of said Jacob Dawson, made on the 10th day of May, 1869. He died on the 18th day of June following, leaving surviving him his wife, Editha J. Dawson, and six minor children. The will, omitting the formal parts, is as follows:

"After all my lawful debts are paid and discharged, the residue of my estate, real and personal, I give, bequeath, and dispose of as follows, to-wit: To my beloved wife, Editha J. Dawson, I give and bequeath all my estate, real and personal, of which I may die seized, the same to remain hers, with full power, right, and authority to dispose of the same as to her shall seem most meet and proper, so long as she shall remain my widow; upon the express condition, however, that if she should marry again, then it is my will that all of the estate herein bequeathed, or whatever may remain, should go to my surviving children, share and share alike, and in case any of my children should have deceased, leaving issue, then the issue so left to receive the share to which said child would be entitled. I likewise make, constitute, and appoint my said wife, Editha J., to be executrix of this my last will and testament, hereby revoking all former wills made by me."

This will was duly admitted to probate, and the real estate belonging to the estate of Jacob Dawson was conveyed by the widow under the will.

In the trial of the cause a large amount of testimony was taken in the case, which is preserved in the bill of exceptions now before us.

The court made the following findings: "The court finds, first, that the will executed by Jacob Dawson on the 15th day of June, 1869, and under and by virtue of which said Dawson disposed of said real estate in controversy, was intended to and did vest the full and complete title in fee simple to said real estate in his widow, Editha J. Dawson, so long as she should remain single.

"2d. That said Jacob Dawson, at the time of the making and execution of said will, and at the date of his death, was seized of very little personal property, and was possessed of practically no means aside from the real estate in controversy, and that it was the intention of said testator that the full and complete legal and equitable title

to said real estate should vest in Editha J. Dawson, so long as she should remain single and unmarried, for the support and maintenance of herself and her children, who were minors at that time.

"3d.   That said Editha J. Dawson sold and conveyed said real estate for a full and valuable consideration to plaintiffs and their grantors, receiving the consideration money so paid for said real estate, for the use of herself and her minor children, and that said proceeds were so used.

"4th.   That the several plaintiffs in said petition named, as their interests appear at the date of the trial of this cause, are entitled to the relief as prayed for in their said bill."

Of the same date, but said to have been dated back, we find the following additional findings, the individual names of the plaintiffs and defendants being given in the title of the judgment:

"Now on this 14th day of December, 1887, this case coming on further to be heard, and the court having duly considered the pleadings and testimony therein, and listened to the argument of the counsel, and having been duly advised in the premises, doth find, all and singular, the issues joined in said action in favor of the plaintiffs, and the allegations of the plaintiff's petition to be true, and doth further especially find:

"1st.   That the will set forth in the pleadings in said action, executed by Jacob Dawson, on the 15th day of June, 1869, and by virtue of which said Dawson disposed of his said real estate in controversy herein, was intended by said Dawson to convey and deed, and have a full title in fee simple to said real estate, to his widow, Editha J. Dawson, so long as she should remain such widow, with full and lawful power and authority to sell and convey the same during her widowhood.

"2d.   That said Jacob Dawson, at the time of making

and execution of said will, and at the time of his death, was seized of very little personal property, and was possessed of practically no means aside from the real estate in controversy, and that it was the intention of said testator that the full and complete legal and equitable title to said real estate should vest in said Editha J. Dawson, so long as she should remain single and unmarried, for the support and maintenance of herself and children, who were minors at that time, with full power and authority to sell and convey the same in fee simple during her said widowhood.

"3d.    That said Editha J. Dawson sold and conveyed said real estate, for a full and valuable consideration, to the plaintiffs below named and their grantors, receiving the consideration money so paid for said real estate, for the use of herself and her minor children, for their support, nurture, and education, and that said proceeds were in fact so used.

"4th.    That the said several plaintiffs below named, as their interest appears at the date of the trial of this cause, are respectively entitled to relief as prayed for in their petition herein; to each of which findings defendants severally except.

"It is therefore considered, ordered, adjudged, and decreed by the court here that the said defendants and each and all of them, and all persons claiming through or under them, or any of them, or acting or assuming to act by the authority or with the connivant defendants, or any of them, be and are hereby perpetually restrained and enjoined from in any manner, by suit, action, or proceeding by law or in equity, in the courts of this state, or in any other courts, assailing or traducing or questioning the title or possession, or right of possession, of Samuel W. Little to the premises in the amended petition described, that is to say:" (Describing the lots.)

The court then proceeds to describe the property to which each plaintiff is entitled, and rendered a decree, as

prayed in the petition. The defendants object in their brief to this latter finding and judgment, but as we find them signed by the judge who tried the cause, they are properly in the record. The defendants appeal.

The will in question was construed by the supreme court of the United States in *Giles v. Little*, 104 U. S., 291, and it was held, that the will merely conferred an estate upon Editha Dawson during widowhood, and in case she married again the remainder in fee passed to his children. The words in the will, "or whatever may remain," were construed as applying alone to the personal estate, and did not affect the realty. The decision is based on the prior one of *Smith v. Bell*, 6 Pet., 68.

At common law, in order to devise lands to another in fee, it was necessary to use words of inheritance, or equivalent words, showing an intention to give such estate; and a mere devise of real estate without words of inheritance gave the devisee only a life estate.

"The proper and technical mode of limiting an estate in fee simple is to give the property to the devisee and his heirs, or to him, his heirs and assigns forever; but such an estate may, even under a will made before 1838, be created by any expression, however informal, which denotes the intention." Sec. 3, Jarm. Wills (5 Am. Ed., 30, et seq.). *Dew v. Kuehn*, 25 N. W. R., 215. The presumption at common law is, that only a life estate was intended to be devised, unless words of inheritance or words of like import were used.

The construction of the will in question by the U. S. supreme court under the common law, had that controlled the case, therefore, no doubt was correct.

The common law rule, however, has been changed in this state in two important particulars: First, "The term 'heirs,' or other technical words of inheritance, shall not be necessary to create or convey an estate in fee simple." Comp. Stat., Chap. 73, Sec. 49. And second, "Every de-

vise of land in any will hereafter made shall be construed to convey all the estate of the devisor therein which he could lawfully devise, unless it shall clearly appear by the will that the devisor intended to convey a less estate." Comp. St., Chap. 23, Sec. 124.

The first of these sections is not referred to in the opinion of the U. S. supreme court, and probably the court's attention was not called to it, and the latter section was by mistake, no doubt, copied incorrectly, the word "clearly" being omitted. *Giles v. Little*, 104 U. S., 299. Mr. Justice Wood, therefore, in writing the opinion, gave no weight to the section whatever. The section of the statute in question was copied from the statute of Michigan, and its proper construction was before that court in *Weir v. Mich. Stove Co.*, 44 Mich., 506, 7 N. W. R., 78. *Chandler v. Shaw*, 52 Id., 18, 17 N. W. R., 223.

In *Weir v. Mich. Stove Co.* it is said, "The language of the testator in the bequest to his wife is clear and unqualified, and unless restricted by what follows, should not be open to question. Does it clearly appear by what follows thereafter that the devisor intended to convey less than his entire estate to his wife? If there are doubts, then, under the statute, they must give way to the otherwise clearly expressed intention.

In *Dew v. Kuehn*, 64 Wis., 300, 25 N. W. R., 212, the supreme court of Wisconsin, under a statute substantially the same as our own, held that the statute changed "the rule as to the presumption of the estate devised," and such we understand to be the effect.

In *Robbins Exr. v. Robbins*, 9 S. W. R., 254, where the testator in his will had directed certain real estate sold as soon as the executor thought best for the estate, or his widow, the proceeds to be invested in bonds for her use, she was prohibited from loaning the proceeds, but permitted to use the interest as well as the rents. There were other devises of property to the wife, "to do with as she might

think fit." The court held that she took an absolute fee in the land, in view of the Kentucky statutes, that estates shall be deemed in fee simple unless a contrary intention appear.

Applying this rule to the case at bar, after providing for the payment of his debts, the testator devises, "To my beloved wife, Editha J. Dawson, I give and bequeath all my estate, real and personal, of which I may die seized, the same to remain and be hers, with *full power, right, and authority to dispose of the same as to her shall seem proper*, so long as she remains my widow." The conditions will be considered presently. No one will contend that it clearly appears from the above language that the testator did not intend to devise the fee.

In *Kaufman v. Breckenridge*, 117 Ill., 305, the bequest was in the following words: "I give and bequeath to my beloved wife, Martha Long, all my goods, estates and chattels, real and personal and mixed, to have, hold, and use the same so long as she may remain my widow, said goods, estates, etc., to be disposed of and used agreeably to her direction and approval, and in such manner as she may deem most conducive to the welfare and comfortable subsistence of herself and our beloved children, William D. Long, Henry C. Long, and Lucy L. Breckinridge." An exception was made in favor of the homestead, and the court held that a deed made by the widow for a portion of the devised real estate, except the homestead, conveyed the fee.

In *Henderson v. Blackburn*, 104 Ill., 229, the terms of the bequest were as follows: "After the payment of said funeral expenses and debts, I give, devise, and bequeath unto my beloved wife, Polly Blackburn, all of my estate, both real and personal, to have and to hold, or to dispose of so much of the same as she may need, or wish to use during her life-time." The court held, that the widow had the power to dispose of the property for her own purposes during her life-time, but as the deed made by her

did not take effect until after her death, it was not within the terms of the power.

In *Pruden v. Pruden*, 14 O. S., 251, the terms of the bequest were: "I do give and devise to my beloved wife, Mary (after payments named in above items 1st and 2d), in case she shall survive me, all and singular my moneys, credits, rights, and choses in action, personal and real estate, and property, for her benefit and support, and for her to have and to hold during the term of her natural life." The court held, that the words, "for her benefit and support," gave the widow the right to use either the principal or interest, or both, so far as may be necessary for this purpose.

In *Helmer v. Shoemaker*, 22 Wend., 137, it was held, that where a testator devises all his real and personal estate to a devisee, giving him the power of unqualified disposition of the property devised, the devisee takes a fee simple absolute in the real estate.

In *Vanhorn v. Campbell*, 100 N. Y., 287, it was held, that an absolute power of disposition and next to a primary devise in fee is deemed conclusive of the existence in the devisee of an absolute estate. The opinion of the majority of the court contains an exhaustive review of the decisions to the year 1885. Ruger, Chief Justice, dissented.

In *State v. Smith*, 52 Conn., 557, the testator, after bequeathing one-half of his estate to his wife, made the following bequest: "I give and bequeath to my wife, Sophia, the remaining half of my estate, both personal and real, with the right to sell, dispose of, convey, and use the same, without any restriction whatever, during her natural life; and at her decease, one-half of what remains of my estate I give and bequeath to my brother, Willis Anderson, and to my sister, Polly Cone, and my sister, Nancy Hungerford, to be divided between them equally." The court held, that the widow had an absolute power to dispose of the second half

of the estate during her life, and that a conveyance made by her carried a good title and fee.

Many other cases to the same effect might be cited, but the further citation of authorities on this point seems to be unnecessary. It may be said, however, that the words of the condition qualify the "full power, right, and authority to dispose of the property, as to her shall seem meet and proper so long as she shall remain my widow." The limitation on this right to convey is declared in the will to be "upon the express condition, however, that if she shall marry again, then it is my will that all of the estate herein bequeathed or *whatever shall remain* shall go to my surviving children share and share alike." This, however, is not a condition affecting conveyances previously made by the devisee, but simply declares that upon her marriage the power to convey the estate shall cease.

In *Campbell v. Beaumont*, 91 N. Y., 464, the terms of the will were: "I leave to my beloved wife, Mary Ann, all my property    *    *    *    to be enjoyed by her, for her sole use and benefit, and in case of her decease, the same, or such portion as may remain thereof, it is my will and desire that the same shall be received and enjoyed by her son Charles,    *    *    *    requesting him, at the same time, that he will use well and not wastefully squander the little property I have gained by long years of toil." In an action for a construction of the will, it was held, that the widow took an absolute title, and therefore had the power to dispose of the whole estate unaffected by the provision as to her son.

In *Helmer v. Shoemaker*, 22 Wend., 137, the testator gave all his estate, real and personal, of which he was then or should be in possession at the time of his decease, to his wife, Margaret, without any words of limitation; he then added, "I also will and bequeath to my daughter, Charity Helmer, the wife of Michael Helmer, all the avails of the property that may remain at the decease of my wife,

Margaret, until Rudolph Helmer, the son and heir of her, the said Charity, shall become 21 years of age, then the said property, more or less remaining, shall be the property of him, the said Rudolph, supporting his mother, Charity, if it may be wanting, so long as the property remains." It was held, that the original devisee took an absolute title by the will, and that her conveyances of the real estate were valid and effective.

In *M'Donald v. Walgrove,* 1 Sandf. Ch., 274, cited with approval by the court of appeals of New York in *Vanhorn v. Campbell,* 100 N. Y., 287, the terms of the will were as follows: "After all my just debts be paid and discharged, I give and bequeath unto my beloved wife, Esther Walgrove, all my personal estate, goods, and chattels; I also devise unto her, the said Esther, all my real estate, the same to be at her entire disposal; but should any part thereof remain unsold at the time of her decease, I devise the same to those of my children who are now living (viz., George Azarias, John, William, Stewart, and Eliza), which may then survive, and to the heirs of those of them which may have deceased in the interim, to be equally divided amongst my said children, share and share alike, in such manner as my executors hereafter named shall believe to be most for the advantage of my said children and their heirs, whether to sell and divide the proceeds or otherwise." The chancellor says: "I find the doctrine well settled, that an absolute ownership or capacity to sell in the first taker, and a vested right by way of executory devise in another, which cannot be affected by such alienations, are perfectly incompatible estates, and repugnant to each other, and the latter is to be rejected as void."

The leading case on this subject is *The Attorney General v. Hall* (Litz.), 314, decided in 1731, where the testator, being the owner of real and personal estate, devised it to his son and the heirs of his body, but if he should die leaving

no heirs, then so much of the real and personal estate as the son should be possessed of at his death was devised to the Goldsmiths Co. at London, for charitable purposes. The son conveyed the real estate and transferred the personal property to his wife, and died without issue. The court held, that as the absolute ownership of the property had been given to the son, who had disposed of the same, that the limitation over to the Goldsmiths Co. was void.

In *Ide v. Ide*, 5 Mass., 500, the testator bequeathed to his son and to his heirs and assigns forever, certain real and personal estate, and then added that if the son died without heirs the estate which he *should leave* was to be equally divided between two other persons. The son conveyed the real estate and died without leaving heirs. The question arose between those claiming under the limitation over, and those claiming under a conveyance from the son, and the court held, that the conveyance passed the title. It is said : "Whenever it is the clear intention of the testator that the devisee should have an absolute property in the estate devised, a limitation must be void, because it is inconsistent with the absolute property supposed in the first devisee. And a right in the first devisee to dispose of the estate devised at his pleasure, and not a mere power of specifying who may take, amounts to an unqualified gift."

These cases are followed by *Jackson v. Bull*, 10 John., 19, and *Jackson v. Robins*, 16 John., 537, and have been followed by the courts of New York, and generally by the courts of other states from that time until the present. And so far as the writer is advised, there are but few decisions to the contrary.

In the case at bar, if the widow married again, then whatever remained of his estate should descend to his children, clearly implying that nothing but the estate undisposed of should thus descend. We know of no reason why this should be limited to the personal estate, when there is no such restriction in the will. In our view,

therefore, the words apply to such portion of the estate, either real or personal, as should remain undisposed of, and only to such portion.

A large amount of testimony was introduced for the purpose of showing the situation of the testator, the number of his family, and their means of subsistence, actual and prospective, at the time he made his will. Words when used with propriety are a very imperfect vehicle of thought, and frequently to correctly appreciate their meaning it is necessary to possess a knowledge of the persons and things to which they are applied, hence the law permits a will to be read in the light of the surrounding circumstances, and authorizes the introduction of such extrinsic evidence as will enable the court to place itself in the testator's situation, and to see things as he saw them, and to apply his language as he intended it. The testimony tends to show that the testator possessed less than $1,000 of personal estate. This included personal property which rightfully belonged to the wife. He was owing a debt secured by a mortgage in Otoe county somewhat in excess of $2,000. A decree of foreclosure was rendered in September in the year 1869, and a sale had under the decree. After selling the mortgaged property there was a deficiency of more than $2,000, which was afterwards paid. His property consisted almost exclusively of real estate in Lincoln—the property in dispute.

M. H. Hathaway, a witness called by the plaintiffs, seems to have possessed unusual opportunities for acquiring information in regard to the estate. He testifies:

Q. Was you well acquainted with him?

A. I was very well acquainted.

Q. Are you a relation?

A. I was a cousin, and also a brother-in-law of Jacob Dawson.

Q. Were you ever in business with him?

A. I was at different times and in various ways. I

was in partnership with him, came west with him, and been in business with him.

Q. Do you know anything about his making arrangements to build a new dwelling-house before he died; and, if so, state all you know about it?

A. In '68, late in the fall, he showed me where he expected to build, south-east of the capitol.

Q. Was a building ever put up at that place?

A. Yes, there was a building put up there after his death.

Q. Did he state to you anything about the plan, or what kind of a building he desired?

A. I don't know the size or style of the building. It is a vague impression in my mind that he talked about a stone building there, but I would not swear positive as to that. I have that sort of an impression, that he talked about putting up a stone building.

Q. Did you know the land that he owned at that time— the property that he owned here at that time—the real estate?

A. He showed me about all that he did own, I think —talked to me very thoroughly about it.

Q. Was a part of that the same as what is known as Dawson's addition to South Lincoln?

A. Yes, sir.

Q. Did you know at that time what that land was worth—about the time of his death in 1869?

A. I would not like to put any price. Of course people were asking wild prices frequently—I thought so at least. He tried to sell me a piece of land, a forty acres that lies very near south, I think, from the capitol; but I was afraid, thought that he asked too much for the land, and was afraid to buy.

Q. By the court: You cannot state the price?

A. I cannot state the price.

Q. What kind of land was it, as to being cultivated or uncultivated, productive or unproductive?

A. I don't think he had but very little under cultivation, if any.

Q. Do you know anything about his financial affairs —whether or not he had any income except it was from the real estate he had; if so, state what you know about that?

A. I am pretty confident that he had not any income. I don't think his property or anything else was productive of any income—produced any income.

Q. Do you know anything about his being in debt at the time he died; if so, state what you know about that?

A. He was badly involved a few years before he died, and left some debts not canceled when he died, the exact amount, of course I cannot say, but I know it in a general way.

Q. Did you ever have any conversation shortly before he died, and about his finances; if so, state what they were?

A. Well, I had some conversation with him at this time, late in the fall of '68, but I cannot say as to any specified amount.

Q. What did he say about his finances at that time?

A. I don't know as I can give any special figures or facts, but if you would allow me in a little kind of roundabout way to show how the conversation was, I could make it plain.

Q. State the conversation, any way?

A. He wanted me to come to Lincoln, and go with him into a printing office, telling me something about what he owed, and how he expected to get through with it, and that is about the sum and substance of the conversation. I advised him to keep out of it.

Q. You cannot state any particular amount?

A. I cannot. It is in a kind of general way an impression on my mind some $2,000 or $3,000. But it is nothing positive or definite.

Q. You stated that his property was not productive.

By what means was he supporting, prior to his death, his family.

A.   Some two or three years before his death, I think, it was by scraping up salt in the salt basin, and hauling it to Nebraska City, and selling it.   Later than that, it was either by borrowed capital or selling things.

The clear weight of testimony corroborates that of Mr. Hathaway.   There is some testimony as to amount per month which the estate could collect for rents, but if we consider the highest amount proved as the correct sum, it is wholly inadequate to meet the obligations against the estate.   To provide for these, there is no doubt the widow was empowered under the will to sell and dispose of such portions of the real estate as she found to be necessary. It was said on the argument, in effect, that she would have had this power under the statute—that is, upon a petition being filed in the proper court showing the necessity for a sale of the real estate, or some portion thereof, that an order to sell would have been granted, under which sales could have been had and the title conveyed.   But sales procured in this manner are necessarily expensive, and must be at public auction to the highest bidder.   This is necessary to prevent collusion and fraud, but experience has shown that it is rare indeed that property can be sold in this way at a forced sale for its full value, or as well as at private sale.   The testator evidently was a man of considerable experience in business affairs, and no doubt sought to avoid the expense, delay, and inconvenience of making sales under orders of court, hence his widow was clothed with power to make conveyances.

So far as we can see, the widow acted in good faith in selling the estate, supporting the children of the testator and paying the debts.   She does not appear to have squandered the estate.   It may be said that the amount realized from the sales was but little compared to the present value of the property.   That is true, but we must

remember that most of these sales took place while Lincoln was an inconsiderable town, and before there was any certainty as to its future growth and prosperity. That uncertainty has been removed by the events of the last six or eight years. At the times the sales took place the amount realized from each tract does not appear to have been disproportionate to its value. But, however this may be, even if Mrs. Dawson had squandered the estate before marrying again, it could not affect conveyances made by her before such second marriage. The title of such grantees does not depend upon the degree of care which she exercised in disposing of the property, but on her power to sell and convey.

The testimony shows that in 1875 Mr. L. C. Burr, one of the defendants herein, became the attorney of Mrs. Jacob Dawson, and sold lots for her belonging to said estate, and represented the title to be good. These lots seem to have been sold largely on credit, and he collected a number of the payments thereon for her, and in all cases, so far as the evidence shows, he held up the title as good; and purchasers testify that they relied on such representations. He testifies that he had not examined the will until late in the year 1879, and then discovered the want of power therein; and that upon such discovery he advised Mrs. Dawson thereafter to execute deeds without covenants. The evidence shows that at the time of this alleged discovery the real estate had all been sold, and Mrs. Dawson was about to marry again. None of the purchasers, however, seem to have been apprised of the alleged defect of title, or that his former representations were made under a mistake. There is an effort in the evidence to show that this was merely his opinion, as distinguished from a statement of a fact, but the representations seem to have been such as to preclude Mr. Burr from claiming title as against such parties.

The testimony also shows that lots were sold and the

proceeds used directly to supply the necessary wants of the widow and the minor heirs.

Mr. George Weber, a witness called by the plaintiffs, testified:

Q. Are you acquainted with the property known as Dawson's addition to South Lincoln?

A. I am, somewhat.

Q. Are you one of the plaintiffs in this suit?

A. Yes, sir.

Q. Did you ever buy any of that property in Dawson's addition to South Lincoln?

A. I did.

Q. Who did you pay for that property?

A. I paid it up, part of it, to L. C. Burr, and the larger part of it to Mrs. Dawson direct, in the shape of groceries and provisions.

Q. For her family?

A. For her family.

Q. Is that the property now in dispute you claim in this action that you paid for in that way?

A. It is.

Q. State when you paid for it in that way?

A. To the best of my recollection it was in 1876 or 1877. I am inclined to think it was '77, it was soon after this—two years.

Q. How long were you paying for it in that way?

A. I think about a year.

Q. State how the payments were made?

A. Mr. Burr, who was the attorney for Mrs. Dawson at that time, came to me and asked me whether I would not as soon pay for that property in groceries and provisions for Dawson's family. I said of course I would, I would like the chance to do it. So he says, "You give Mrs. Dawson a pass book, and let them have whatever they want in the line of groceries, and put it in the pass book, and every month, or as often as you feel like doing

it, present the amount, and I will endorse it on the notes."
That was satisfactory to me, and I thought Mr. Burr was
a nice man for giving me the chance to do it.

Q.    What business were you in at that time?

A. · Grocery business.

There is other testimony to the same effect.    The heirs
seem to have been fed and clothed during their minority
with means derived from the sales of their father's estate,
and while retaining all these benefits, as well as the benefit
of the payment of the debts of their father by such sales,
they ask for the land also.    If they were entitled to such
a judgment, it would be upon purely legal grounds, and
not for equitable considerations.

It is unnecessary to refer further to the testimony.
There is no doubt, both from the will itself and from the
circumstances as proved under which it was made, that the
intention of the testator was to empower his widow to con-
vey all of his real and personal estate, if she saw fit to do
so, and as she had exercised this right and power before her
remarriage, the grantees under her deeds acquired all the
title of the testator to such lands.

The decree of the district court as to all the plaintiffs
who did not disclaim is therefore affirmed.

JUDGMENT ACCORDINGLY.

THE other judges concur.